No. 81-403

IN THE SUPREME COURT OF THE STATE OF MONTANA

1982

---

E. ALLEN TOMPKINS and MYRTLE TOMPKINS,
heirs of HILLARY TOMPKINS, deceased,

Plaintiffs and Appellants,

vs.

NORTHWESTERN UNION TRUST COMPANY OF HELENA, MONTANA,
et al.,

Defendants and Respondents.

No. 81-404

JAMES V. SMITH and ROSENA A. SMITH,
heirs of LARRY B. SMITH, deceased,

Plaintiffs and Appellants,

vs.

NORTHWESTERN UNION TRUST COMPANY OF HELENA, MONTANA,
et al.,

Defendants and Respondents.

---

Appeal from:  District Court of the First Judicial District,
In and for the County of Lewis and Clark
Honorable Gordon Bennett, Judge presiding.

Counsel of Record:

For Appellants:

C. W. Leaphart, Sr. argued and S. W. Leaphart, Jr.,
argued, Helena, Montana

For Respondents:

Recht and Greef, Hamilton, Montana
John D. Greef argued, Hamilton, Montana
Kline and Niklas, Helena, Montana

---

Submitted:  February 23, 1982

Decided:  May 11, 1982

Filed:  MAY 11 1982

_Thomas J. Kearney_
Clerk

Mr. Justice Frank B. Morrison, Jr., delivered the Opinion of the Court.

Plaintiffs appeal from judgment entered for defendant and the denial of a new trial motion. This is a negligence action for wrongful death, brought in the First Judicial District Court, Lewis and Clark County. We reverse and remand for a new trial.

The action arises out of an airplane crash in which all aboard were killed. On September 19, 1978, pilot Herschel Dean Moore, III, left Missoula bound for Bozeman at 3:30 P.M. Moore had three passengers in a Piper Archer II rented from Executive Aviation in Missoula. Six miles west of Hall, Montana, near 4:00 o'clock P.M., the plane crashed into a hill at 5,500 feet. The accident site was approximately 15 miles southwest of Drummond, Montana.

Pilot Moore, a University of Montana student, had obtained his pilot's license a month prior to the crash. He had 71 hours total flying time, including 23 hours solo time. He was not instrument rated, but was described as an excellent student pilot by his flight instructor.

Pilot Moore obtained a weather briefing at 1:30 P.M., but did not receive a briefing immediately prior to departure at 3:30 P.M. According to the meteorologist who testified, the weather improved slightly over Drummond between 1:30 P.M. and 3:45 P.M.; there was a ceiling of broken clouds which had lifted from 3,500 to 4,000 feet; the wind at 1:30 P.M. was 22 miles per hour; the visibility remained at 12 miles throughout; there was a precipitation area 15 to 20 miles southwest of Drummond. The weather in Bozeman had deteriorated to Instrument Flight Rules by 4:30 P.M.

Plaintiffs' position was two-fold. First, plaintiffs relied upon the legal theory of _res ipsa loquitur_ to establish liability. Secondly, plaintiffs alleged that the pilot, being inexperienced, had negligently flown into cloudy, squally, weather which caused him to become disoriented and to lose control of the aircraft. Plaintiffs' expert witness testified that the aircraft went into a descending spiral, overstressing the wings and tail, and causing the aircraft to come apart.

Defendant countered with expert testimony which contradicted the "descending spiral" theory espoused by the plaintiffs' expert. Defendant's expert witness testified that, because debris was found along an almost straight line over 2,000 feet in length, the aircraft could not have been spiraling down. Defendant's experts testified that the left wing flap of the aircraft came off before the crash and that this detached flap struck and broke the tail assembly which controlled vertical direction. Defendant's proof attributed the cause of the accident to this equipment failure.

The trial court submitted the case to the jury, omitting plaintiffs' theory of _res ipsa loquitur_ from the jury instructions. Defendant contended at the trial court level, and here contends, that _res ipsa loquitur_ is inapplicable because defendant's experts testified to a cause of the crash which negated any presumption of negligence. The trial court agreed.

The jury returned a verdict for defendant on the negligence issues. Judgment was entered accordingly and plaintiffs appeal.

Plaintiffs raise the following errors:

(1) The jury verdict for defendant was contrary to the weight of the evidence and the law.

(2) The District Court erred in allowing defense experts to testify regarding defective equipment since such defense was not raised in the pleadings.

(3) The District Court erred by allowing the defense to inject the issue of strict liability into a negligence case.

(4) The District Court erred in not submitting res ipsa loquitur to the jury.

We affirm the District Court's rulings on issues 1, 2, and 3, but reverse on issue 4.

SUFFICIENCY OF THE EVIDENCE

Plaintiffs contend that the jury's verdict is contrary to the evidence and to the law. Defendant produced expert testimony which negated plaintiffs' theory of how the accident occurred. Plaintiffs' expert witness testified that the aircraft came apart because it went into a descending spiral. Plaintiffs proof sought to establish that the descending spiral resulted from an inexperienced pilot becoming disoriented in unfavorable weather conditions. Defendant's proof was designed to show such a theory to be ill-founded since debris was scattered in a straight line over a distance of some 2,000 feet. There was clearly a conflict in theories and proof which required submission of the issue to a jury. Gunnels v. Hoyt and Balsam (1981), 38 St.Rep. 1492, 633 P.2d 1187. There is sufficient support in the record to uphold a jury verdict in favor of either the plaintiffs or the defendant. Therefore, we reject plaintiffs' first contention.

Plaintiffs contend in issue 2 that the District Court erred in allowing proof of a defense not raised in the pleadings. Issue 3 concerns alleged District Court error in allowing injection of strict liability theories. These

-4-

issues are intertwined and we treat them together.

Defendant's answer denied that pilot negligence was the cause of this crash. Pursuant to this allegation, defendant was entitled to offer proof establishing another cause for the accident. The expert testimony offered by defendant, which sought to establish equipment failure as the cause of the accident, negated plaintiffs' allegation that the decedent pilot became disoriented and put the aircraft into a descending spiral.

Rule 8(c), M.R.Civ.P., does not require the negligence or conduct of third parties to be pleaded as an affirmative defense. See also Graham v. Rolandson (1967), 150 Mont. 270, 435 P.2d 263, where this Court held unavoidable accident did have to be pleaded affirmatively.

Strict liability theories were not involved. Defendant simply offered equipment failure as the cause of the accident. The District Court was clearly right in permitting such proof.

The District Court's failure to give a res ipsa instruction in this case is the dispositive issue on appeal. Defendant relies upon two legal principles and primarily two cases in support of opposition to a res ipsa instruction. First, defendant contended at the trial court level and contends here, that the decedent pilot did not have the requisite degree of control required for application of the res ipsa doctrine. Defendant relies upon Campbell v. First National Bank (D.N.M. 1973), 370 F.Supp. 1096. Defendant also alleges that where proof is offered explaining the cause of the accident in such a way that plaintiffs' allegations are refuted, res ipsa loquitur is not available to the plaintiffs. Defendant relies upon Mets v. Granrud (1980), 37 St.Rep. 313,

314-315, 606 P.2d 1384, 1386.

In Campbell, the Federal District Court held that, where the pilot rented an aircraft from an agency the morning before it crashed, "the conclusion is inescapable that the requisite control over the airplane, in its mechanical as well as directional aspects, has not been sufficiently demonstrated to permit the doctrine of res ipsa loquitur to apply." (370 F.Supp. at 1099.) Plaintiffs here attempt to distinguish the Campbell decision on the basis that the evidence in this case showed recent and careful maintenance whereas no such evidence existed in Campbell. This case can be distinguished on an evidentiary basis but we find such a determination to not be dispositive here. We think the Campbell decision to be too narrow in its application of res ipsa and we are drawn to the broader interpretation found in Stoddard v. Ling-Temco-Vought, Inc. (C.D. Cal. 1980), 513 F.Supp. 314.

Stoddard involved 14 consolidated wrongful death actions arising out of an aircraft crash which occurred when a U.S. Air Force C-135B aircraft crashed into the Pacific Ocean. Defendant Ling-Temco-Vought, Inc. had made structural changes to the body of the aircraft and the crash resulted shortly thereafter. Plaintiff alleged faulty design, construction, inspection and testing of the aircraft by both the United States and Ling-Temco-Vought contractors during and after the modification. Each of the two defendants argued that res ipsa loquitur had no application because both of the two defendants could not have "exclusive control."

Judge Paul Hatfield rejected this narrow construction, holding that res ipsa loquitur had application to multiple defendants. Judge Hatfield said:

-6-

> "LTV, et al., and the United States are the
> only parties arguably responsible for the
> accident since other defendant parties to
> this lawsuit have apparently been exonerated.
> Neither the United States nor LTV can escape
> the application of res ipsa loquitur under a
> narrow interpretation of the 'exclusive con-
> trol' requirement.  The facts as presently
> alleged suggest that defendants LTV, et al.,
> and the United States are both subject to the
> doctrine.  Nevertheless, if there is sufficient
> doubt as to control, that question can become
> one for the jury or trier of fact.  Northwest
> Airlines, Inc. v. Rowe, 226 F.2d 365 (8th Cir.
> 1955) cited with approval Barnes v. North-
> west Airlines, Inc., 233 Minn. 410, 47 N.W.2d
> 180 (1951)."

In Little v. Grizzly Manufacturing (1981), 38 St.Rep.

1994, 636 P.2d 839, this Court quoted the res ipsa loquitur

doctrine from Whitney v. Northwest Greyhound Lines (1952),

125 Mont. 528, 533, 242 P.2d 257, wherein it is stated that:

> "When an instrumentality which causes injury,
> without any fault of the injured person, is
> under the exclusive control of the defendant
> at the time of injury, and the injury is such
> as in the ordinary course of things does not
> occur if the one having such control uses
> proper care, then the law infers negligence
> on the part of the one in control as the cause
> of injury."

The statement quoted is an accurate statement of the

law.  However, the court did not state that exclusive and sole

control was a necessary element of a res ipsa case.  In fact

it is not.  The doctrine of res ipsa loquitur is stated in

Restatement of Torts Second, Section 328D, as follows:

> "(1)   It may be inferred that harm suffered
> by the plaintiff is caused by negligence of
> the defendant when
>
> "(a)   the event is of a kind which ordinarily
> does not occur in the absence of negligence;
>
> "(b)   other responsible causes, including the
> conduct of the plaintiff and third persons,
> are sufficiently eliminated by the evidence;
> and
>
> "(c)   the indicated negligence is within the
> scope of the defendant's duty to the plaintiff.

"(2) It is the function of the court to determine whether the inference may reasonably be drawn by the jury, or whether it must necessarily be drawn.

"(3) It is the function of the jury to determine whether the inference is to be drawn in any case where different conclusions may reasonably be reached."

There are cases where the facts compel the inference of res ipsa loquitur. See Newing v. Cheatham (1975), 124 Cal.Rept. 193, 540 P.2d 33. In other cases, the inference is permissive but not mandatory. See Little v. Grizzly Manufacturing, supra. The question here is whether res ipsa should be submitted to the jury at all.

Comment g to section 328D, Restatement of Torts Second, is instructive. The following language is taken from Comment g:

"It is not, however, necessary to the inference that the defendant have such exclusive control; and exclusive control is merely one way of proving his responsibility. He may be responsible, and the inference may be drawn against him, where he shares the control with another, as in the case of the fall of a party wall which each of two landowners is under a duty to inspect and maintain. . . Exclusive control is merely one fact which establishes the responsibility of the defendant; and if it can be established otherwise, exclusive control is not essential to a res ipsa loquitur case. The essential question becomes one of whether the probable cause is one which the defendant was under a duty to the plaintiff to anticipate or guard against."

The proof of exclusive control assists the plaintiff in establishing probable cause in a res ipsa loquitur case. However, concurrent causes may exist and yet not foreclose reliance upon res ipsa loquitur.

In this case, proof of equipment failure does not deny the application of res ipsa loquitur for a pilot error may have combined with equipment failure to produce the result. Plaintiffs' proof here was reinforced by testimony that a

-8-

recent check of equipment had found it to be sound, but such proof is not essential.

The pilot, Moore, was in exclusive control of the aircraft at the time the crash occurred. No other occupants were pilots. The fact that a third party was responsible for maintaining the aircraft does not foreclose the application of res ipsa loquitur. To engage such rationale would render res ipsa inapplicable on the basis that an aircraft was manufactured by someone other than the pilot and therefore exclusive control was lacking.

If in fact, the accident speaks of negligence, and if the undisputed evidence does not show the accident resulted from the conduct of another, then the doctrine of res ipsa loquitur may attach.

Defendant very properly relies upon our decision in Mets v. Granrud, supra. In that case, an automobile left the highway and hit a pole, killing the passenger and injuring the driver so severely that he could not remember the accident. The decedent's wrongful death case depended upon the application of res ipsa loquitur. This Court affirmed a summary judgment for defendant and said:

> "In the instant case, it is possible that there was some lapse on the driver's part and that the driver was negligent, and because of that, the vehicle went off the road and collided with the telephone pole. But it is also possible that the cause of the accident was not due to the driver's fault; and that the cause of the accident was the failure of the brakes to operate, a failure in the steering mechanism, or some other reason not due to lack of care on the part of the driver. See Speiser, The Negligence Case: Res Ipsa Loquitur, Vol. 2, Section 26.7 (1972). In such a situation, the balance of probabilities between, first causes of an accident involving the vehicle which are due to lack of care on the part of the driver, and second, causes of an accident not due to lack of reasonable care, are

> so nearly equal that a conclusion that the
> driver was negligent cannot reasonably be
> found and would be the result of mere specu-
> lation.  This conclusion is further support-
> ed by the conflicting opinions of Denning
> and Godtland concerning the pitman arm and
> the cause of the accident."

In the Mets case, the plaintiff argued that a car does not generally leave the road unless the driver is negligent. In other words, if the driver had control of his vehicle, it would not leave the road absent special circumstances not shown by the evidence in the Mets case.  This Court held that res ipsa had no application because a number of things could have occurred to cause the vehicle to leave the traveled portion of the roadway and hit the pole.

The plaintiffs, in the case at bar, argue that the aircraft would not have struck the hill but for negligence; the accident itself speaks of negligence.  The same argument advanced by the defendant in Mets is advanced in this case; i.e., causes other than pilot error are equally as likely to have produced the accident, and therefore res ipsa does not have application.  There seems to be a strong parallel between the two cases.

In the Mets case, defense produced an expert witness to testify that the pitman arm in the steering assembly broke and, that in his opinion, the broken pitman arm caused the vehicle to leave the roadway.  Such a cause would exonerate the defendant driver.  However, plaintiff countered with expert testimony showing that the pitman arm broke on impact.

In the case at bar, expert testimony was offered by the plaintiffs for the purpose of reinforcing the allegation of pilot error as primary cause.  The defense offered expert testimony refuting plaintiffs' expert evidence and sought to

explain the accident by showing equipment failure. Defendant argues forcefully that if res ipsa loquitur was not applicable to the fact situation in Mets, then it could not be applicable to the fact situation we have here. In Mets a car, without explanation, left the road and hit a pole. In this case, an aircraft flew into the side of a hill without explanation from occupants of the craft itself. In both cases, explanations for the accident come from experts reconstructing the accident. In each case, there is a dispute between experts.

Justice Daniel Shea dissented in Mets. He said:

> "It is reasonable to assume that under normal circumstances automobiles simply do not veer off the road into a borrow pit unless the driver has been negligent. The majority conclusion that it is possible that the accident was not due to the driver's fault, that is, that the cause of the accident may have been due to brake failure, or some other reason, is itself mere speculation. The plaintiffs here were not required to eliminate all possibilities of how the accident may have happened. Plaintiffs were required only to establish a factual basis to infer negligence on the part of the driver. The inference is clear in this case; whether the jury would have accepted this inference is yet another matter." 37 St.Rep. at 319.

We agree with this statement from Justice Shea's dissent. The statement is relevant here. An aircraft flying into the side of a hill speaks of negligence. This case is a proper one for the application of res ipsa loquitur. To the extent that Mets is inconsistent with this opinion, it is hereby overruled.

Defendant relies upon Knowlton v. Sandaker (1968), 150 Mont. 438, 436 P.2d 98. In that case, the evidence established that a welder was killed when a petroleum tank exploded. The evidence established that the explosion was just as likely to have occurred because of the negligence of the decedent as because of any fault on the part of the defendant.

In addressing equally plausible causes the court said at page 447:

> "To have allowed the case to go to the jury on the basis of the doctrine of res ipsa would have allowed the jury to conjecture between two equally plausible explanations of the cause of the accident. In such a case the appellant has failed to establish that there was a greater likelihood that respondents' negligence was the proximate cause of the accident and has thus failed to satisfy a crucial requirement for the application of the doctrine of res ipsa loquitur. See Jackson v. William Dingwall Co., 145 Mont. 127, 399 P.2d 236."

The facts in Knowlton do not support res ipsa loquitur. The evidence showed that the tank in which decedent was welding had not been ventilated. There was testimony that the decedent was told not to weld in the tank if he had any doubts about the tank's explosive potential. The plaintiff's case was premised upon defendant's failure to exercise due care in supplying a dangerous chattel or, in the alternative, on the basis of res ipsa loquitur. The court held that, "[t]he evidence as presented by the appellant clearly showed that the respondents Fruehauf and Sandaker did not have such exclusive control as would make it likely that their negligence, if any, was the cause of the injury complained of."

The court in Knowlton found that the conduct of decedent was just as likely a cause as any conduct on the part of the defendants. The court said: "To have allowed the case to go to the jury on the basis of the doctrine of res ipsa would have allowed the jury to conjecture between two equally plausible explanations of the cause of the accident." Under the facts of Knowlton, such a result is compelling.

The decision in Knowlton is not controlling here. First, the passengers in this aircraft did not contribute to the cause of the accident. Secondly, there are not two

-12-

equally plausible explanations for the accident.  Without any evidence, other than the happening of the accident itself, res ipsa applies where an airplane crashes into the side of a hill.  When each party to the litigation offers expert testimony, attempting to explain the accident, equally plausible alternatives are not thereby presented.  The jury can choose to adopt the testimony offered by one side to the exclusion of the other.  The jury is free to disregard all of the expert testimony.  Where each side produces testimony seeking to explain an otherwise unexplainable accident, res ipsa loquitur may, if the necessary elements are present, have application.

For the foregoing reasons, the trial court erred in refusing to give a res ipsa loquitur instruction in this case.  Therefore, we remand for a new trial with directions to proceed in accordance with the views herein expressed.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____

_____

_____
Justices

Mr. Justice John C. Sheehy, specially concurring:

In addition to my opinion that the res ipsa loquitur instruction should have been given in this case, I find a new trial is required because the verdict in this case is against the evidence.

It ought to be a matter of judicial notice that a Piper PA-28 of the type involved here, if it is flown in level flight within the airspeed recommended by the manufacturer, and is kept out of clouds, will not come apart in the air. If that is not true, none of us should ever fly in airplanes.

In this case, there is no evidence from any expert that the breakup of this aircraft occurred either because of faulty maintenance and/or because of faulty structural components in its manufacture.

The witnesses on the ground near the scene of the crash testified that the day was cloudy and windy with occasional snow and sleet. They described the temperature as "cold". They heard the noise of the motor of the aircraft overhead, but could not see it because of the clouds. They heard the thud of its crash and saw the wreckage of the airplane southwest from the position where they had heard the noise of the motor.

Jeffrey Morrison of Helena, Montana, an experienced flyer in this region, testified that in his opinion, this relatively inexperienced pilot, qualified only for visual flight operations, proceeded into weather which he could have avoided, and which was beyond his limitations, lost control of the aircraft, exceeded the limitations of the aircraft, causing structural damage, which in turn caused the aircraft to come apart and crash. When asked on cross

-14-

examination if he could explain his version of the sequence of the failure, he answered that he could not but that he assumed that the tail failed first because the tail pieces were the first to hit the ground.

In explanation of his opinion, Mr. Morrison testified that this was a classic case of in-flight breakup in crashes of this kind. The inexperienced pilot, enclosed in clouds, becomes disoriented within a matter of 72 seconds; inevitably the airplane turns with its nose down and there is a rapid build up of airspeed in a spiral turn, beyond the structural capability of the aircraft to withstand. The pilot responds to the situation by overreacting, pulling too strongly and too quickly on the controls hoping to restore the airplane to controlled flight. The resulting gravity forces on the plane break it apart.

Two expert witnesses testified for the defense. Both Sheldon Roberts, of San Jose, California, an engineering consultant, and James R. "Bob" Jensen of Los Altos, California, an engineering consultant, testified to the sequence of the breakup of the airplane. In essence, they testified that the left wing flap broke away from the left wing in that the outboard bracket failed first, the middle bracket next, and the flap then flailed in the airstream, pulling the third bracket out of its mooring in the inboard wing. The left wing flap then struck the left stabilator, a part of which was torn off. Thereafter, the tail section rotated upward and counterclockwise, broke off and the crash occurred.

The two California experts based their opinion of the in-flight breakup upon the positions of bits of wreckage along the ground up to the point where the plane ultimately came to rest against the side of the gully. The parts were strewn over some 2,075 feet.

-15-

Nowhere in the testimony, however, do the two California experts give the reason for the separation of the left wing flap. Apart from their version of the sequence of the breakup, there is nothing of substance in their testimony as to how or why the crash occurred.

The experts, however, are each strong in their opinion that the accident could not have happened in the way described by Jeffrey Morrison because of his supposed assumption that the tail failed first. They based their opinion on the distribution of the wreckage.

The distribution of the wreckage was detailed by investigators for the Federal Aviation Administration. Along a magnetic compass heading of 325 degrees, those parts are described in the following sequence:

The first portion of wreckage is the tail cone. The left stabilator tip was found 675 feet further from the tail cone. The left flap was found 40 feet to the right of the left stabilator tip. The stabilator itself was found 275 feet beyond the left stabilator tip. The skin from the left wing root was found 120 feet outside the path of the line of flight, the vertical fin and rudder some 48 feet to the right of the flight path, and the left wing itself was found approximately 215 feet beyond the vertical fin and rudder. 800 feet from the left wing the initial ground impact occurred to the remaining portion of the plane and a short distance further is the gully in which the plane came to rest. Of course, all distances are approximate.

My review of the testimony in evidence indicates that the two experts were speaking from sheer speculation in refuting Mr. Morrison, and in refuting him, they ignored several important facets of evidence:

1. The first piece of wreckage in the line of flight of the airplane was the tail cone.

2. The left wing had torn away from its root in the aircraft. The wreckage indicated that the left wing had been bent downward. This means that the left wing was inverted to the G forces exerted upon it at the time of the breakup.

3. The magnetic compass heading for this airplane, which was on its way to Bozeman from Missoula, would be approximately 93 degrees. The line of wreckage distribution as found by the Federal Aviation Administration investigators was magnetic compass heading 325 degrees. The ground witnesses, however, indicated that the line of distribution of the wreckage was in a southwesterly direction. If the federal investigators are right, this plane was headed toward northern Idaho at the moment of breakup. If the ground witnesses are correct, the plane was headed toward California. The proper heading for this airplane if it were in level undisturbed flight would be nearly due east. The heading of the plane at breakup confirms Mr. Morrison's opinion that the plane was in a tight spiral at the time.

4. The left wing flap at the time of initial breakup was retracted. In this position, the leading edge of the flap is protected by the left wing itself. In the retracted position, the forces on the wing flap (drag and lift) are no greater than the forces exerted on any other portions of the rear wing surfaces. The only plausible explanation for the first separation of the left wing flap is the shuddering of the aircraft caused by its speed beyond its structural capability, and downward pressure exerted on the left wing which eventually caused it to break off.

-17-

The sum total therefore of the testimony from the defendant's witnesses told the jury nothing about the cause of the breakup of the aircraft in flight. The sole tenor of their testimony is to dispute the opinion of Mr. Morrison, who stated he could not describe the exact sequence of the breakup anymore than could the expert witnesses.

I must therefore conclude that the jury was flim-flammed by the impressive degrees and background of the two wise men from California. They are professional testifiers; Mr. Jensen advised counsel for the defendant here that his investigative costs to prepare a case such as this, "probably the minimum would be near $10,000 but it could run over $50,000."

In this case, operating under visual flight rules, the pilot of this aircraft was required to stay out of clouds, one mile distant horizontally and 1,000 feet above or 1,000 feet below. Mr. Morrison's opinion was that in the kind of weather prevailing here, the pilot could easily have avoided such clouds. That the pilot was flying in the clouds in this case is indisputable because that is where the ground witnesses heard the aircraft overhead. He was a pilot not trained for instrument flying rules. Under the circumstances, the resultant crash was nearly as predictable as the time of sunset on September 19, 1978.

A verdict cannot be permitted to stand upon mere conjecture or suspicion. Fabert v. Northern Pac. Ry. Co. (1926), 77 Mont. 446, 451, 251 P. 546, 547. When the question of whether the evidence supports the verdict is before this Court, we have a duty to review the evidence to decide if the verdict is supported by substantial evidence. Bernhard

-18-

v. Lincoln County (1968), 150 Mont. 557, 560-61, 437 P.2d 377, 380.  A verdict must have substantial evidence to support it.  Davis v. Davis (1972), 159 Mont. 355, 361, 497 P.2d 315, 318.  Here there is no substantial evidence to support the verdict of the jury because there is no evidence that this plane would breakup in clear skies in level flight.  Since the plane was flying in clouds at the time of its breakup, the conclusion is inescapable that the pilot got into conditions for which he was untrained and unqualified and which were beyond the capability of the plane to withstand.

John C. Sheehy
_____
Justice

Mr. Justice Fred J. Weber dissenting:

I respectfully disagree with the conclusion of the majority that the failure of the District Court to instruct on res ipsa loquitur was reversible error. I further respectfully disagree with what is essentially a revision of the Montana rule on res ipsa loquitur.

Prior to this case, the rule in Montana has been that, where a defendant presents an "equally plausible explanation" for an accident, which is inconsistent with his own negligence, res ipsa loquitur has no application. Knowlton v. Sandaker (1968), 150 Mont. 438, 436 P.2d 98, and cases there cited.

In the present case the plaintiffs presented extensive evidence aimed at proving negligent conduct on the part of the pilot. Mr. Morrison, a highly qualified and experienced pilot, gave the plaintiff's "plausible explanation" of the crash. Mr. Morrison testified as to the cause of the crash as follows:

> "It's my opinion -- that the pilot proceeded into weather which was beyond his limitations, lost control of the aircraft, exceeded the limitations of the aircraft causing structural damage, causing the aircraft to come apart and crash."

In further explanation of his view of the cause of the crash, Mr. Morrison stated as follows:

> "Q. So I take it it's your opinion that Dean (the pilot), when he -- in your opinion when he was attempting to take the plane out of the spiral, he misused the yoke which put the extra stress on the tail section and caused that section to fail first, is that true?
>
> "A. Yes."

In substance, Mr. Morrison indicated that by pulling back on the yoke, which controls the tail section, the pilot placed extra stress or strain on that section so that it failed and broke

off. Unfortunately that conclusion is not consistent with the location of the wreckage. While Mr. Morrison is a highly qualified pilot, he had not examined either the site of the accident or the aircraft wreckage. His explanation of the cause of the accident was more in the nature of a response to a hypothetical question based upon his years of flying experience in Montana.

The defendant's "plausible explanation" of the crash basically was contained in the testimony of its experts, Roberts and Jensen. These men had investigated more than one hundred aircraft crashes, including several involving Piper PA-28's like the one involved in the present accident. They had outstanding qualifications as engineers, aircraft designers and investigators of aircraft collisions. These experts had studied the wreckage of this particular aircraft at length, examined the wreckage distribution information, and conducted painstaking tests to determine the nature and pattern of the breakup. When they testified, their conclusions were backed up by detailed explanations. The uncontradicted testimony of these two experts showed that the aircraft disintegrated in the air long prior to impact, and that the order of disintegration of the aircraft was as follows: the left wing flap came loose, starting at the outside edge, and swung around until it tore loose at the inside edge from the wing root structure; and the flap then rotated sharply through the air striking the stabilator which is the horizontal tail surface, cutting off the left side of the stabilator; after which the remainder of the stabilator twisted off in one piece, and thereafter the rudder assembly itself tore off. The next part to come off was the left wing itself and it failed at the wing root. Next the fuselage of the aircraft

-21-

struck the ground. The wreckage essentially was in a straight line spread out over a distance in excess of 2,000 feet. Witness Jensen testified that in his opinion he could not find any evidence that pilot error could have caused the wing flap to have come off first. He could not see how in flying and manipulating the flight controls, the pilot could have placed the kind of stress upon the plane which would have caused the left flap to fail in this manner. His testimony and that of witness Roberts showed that the flap itself was in the up or retracted position. Mr. Jensen was asked about the Morrison theory that the accident was the result of a spiral dive in which the aircraft gained speed, at which point the pilot pulled back on the yoke overstressing it, and the tail section came off the plane first. Mr. Jensen testified that it could not have happened in that way. He pointed out that in investigating other in-flight breakups on the same type of aircraft, where the breakup had been from overstressing, he found that the stabilator failed symmetrically so that both halves broke off right at the spar. That was not the manner in which this stabilator broke. First the tail tip came off, and then the balance of the stabilator twisted off. Mr. Jensen further emphasized that the wreckage distribution is not consistent with a spiral type of flight. The conclusion is unrebutted that the disintegration of the aircraft in the air in this manner was both unique and unusual. In particular, such disintegration is as consistent with a failure of the aircraft from inadequate maintenance, or failure of the aircraft from wind shear, as with stress caused by pilot error.

The verdict for the defendant, suggests the jury believed the "plausible explanation" of the defendant. Where the

-22-

evidence shows two plausible explanations, the doctrine in Montana has been that res ipsa loquitur is not applicable. As stated in Knowlton v. Sandaker:

> "To have allowed the case to go to the jury on the basis of the doctrine of res ipsa would have allowed the jury to conjecture between two equally plausible explanations of the cause of the accident. In such a case the appellant has failed to establish that there was a greater likelihood that respondents' negligence was the proximate cause of the accident and has thus failed to satisfy a crucial requirement for the application of the doctrine of res ipsa loquitur." 150 Mont. at 447-448, 436 P.2d at 103.

Without expressly so stating, the majority opinion apparently overrules Knowlton v. Sandaker.

With regard to the element of exclusive control by the defendant in a res ipsa case, Knowlton v. Sandaker following the rule in many other Montana cases stated:

> "'The res ipsa loquitur doctrine simply stated is this: That when an instrumentality which causes injury, without any fault of the injured person, is under the exclusive control of the defendant at the time of the injury, and the injury is such as in the ordinary course of things does not occur if the one having such control uses proper care, then the law infers negligence on the part of the one in control as the cause of the injury.'" (Underscoring added.) 150 Mont. at 446, 436 P.2d at 103.

This of course suggests that exclusive control on the part of the defendant is necessary. The majority opinion refers to Campbell v. First National Bank (D.N.M. 1973), 370 F.Supp. 1096, in which the Federal District Court had held that where a pilot rented an aircraft, the conclusion is inescapable that the requisite control has not been sufficiently demonstrated to permit the doctrine of res ipsa to apply. The majority opinion relied on Stoddard v. Ling-Temco-Vought (C.D. Cal. 1981), 513 F.Supp. 314, in order not to apply the Campbell rationale to the facts in this case where the defendant

pilot had also rented the aircraft.  In doing so, the majority has not followed the express holding of Stoddard v. Ling-Temco-Vought (LTV).  In that case, an Air Force jet had crashed, killing several persons, just 38.2 hours after LTV had completed extensive structural modifications and returned the plane to the Air Force.  The survivors sued both the Air Force and LTV.  The federal court refused to apply a narrow definition of "exclusive control" and stated:

> "If it can be shown that there was joint res-
> ponsibility for the safe operation of this
> aircraft neither defendant need have exclu-
> sive control. . . The doctrine [R.I.L.] may
> still be suitable where it is shown that one
> defendant had control over the instrumentality
> but later relinquished control to another."
> 513 F.Supp. at 321.

The Stoddard court recognized that exclusive control had been "expanded to encompass multiple defendants who are charged by law with joint responsibility for the instrumentality of injury."  (Emphasis added.)  513 F.Supp. at 321-322.

The fact situation in the present case is that Executive Aviation maintained the aircraft and Moore piloted it.  Had the plaintiffs sued both Executive Aviation and the pilot's estate, a res ipsa application under Stoddard v. Ling-Temco-Vought would appear to be valid because exclusive control then would have been shown in both defendants.  That is the holding of Stoddard.  Here Moore's estate was the sole defendant and exclusive control has not been shown in him.

The result of the majority opinion is the overruling of Knowlton v. Sandaker, supra, Little v. Grizzly Manufacturing (1981), ____ Mont. ____, 636 P.2d 839, 38 St.Rep. 1994, Whitney v. Northwest Greyhound Lines (1952), 125 Mont. 528, 242 P.2d 257, and numerous other Montana cases.  As I read various of the Montana cases on res ipsa loquitur I am

frankly puzzled as to the status of res ipsa in Montana. Perhaps it would have been simpler had the majority merely stated that all previous cases on res ipsa loquitur were being overruled.

I would affirm the holding of the District Court in denying the use of the res ipsa instruction.

I would suggest that the present instruction on res ipsa loquitur in the Montana Jury Instruction Guide (No. 22.00) be revised so as to be consistent with today's opinion. The revision should make the instruction broadly permissive in view of today's relaxation of the standards which determine when an offered res ipsa instruction must be given. Ironically the standards actually applied in the majority opinion are more relaxed than those in the offered instruction as well as those in the permissive federal instruction.

Justice